# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45950

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

ANDREW CHARLES MAXIM,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

**Boise, August 2019 Term**

**Opinion Filed: December 4, 2019**

**Karel A. Lehrman, Clerk**

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Peter G. Barton, District Judge.

District court decision denying motion to suppress, <u>reversed</u>, judgment of conviction <u>vacated</u>, and case <u>remanded</u> for further proceedings consistent with this opinion.

Eric Frederickson, Idaho State Appellate Public Defender, Boise, for appellant. Brian Richard Dickson argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Jeffery D. Nye argued.

_____

BURDICK, Chief Justice.

Andrew Charles Maxim appeals from the district court's denial of his motion to suppress drug evidence found on his person after police searched the home he was living in without a warrant. The district court found that the exclusionary rule need not apply under the circumstances because the police would have inevitably discovered the heroin despite any alleged illegality. The dispositive issues on appeal are whether a probationer can object to a search of his home or person when he has waived his Fourth Amendment rights as a condition of probation and whether the district court erred in its inevitable-discovery analysis.

1

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2017, Officer Kyle Ludwig and a second police officer visited an apartment complex in Meridian, Idaho, after police dispatch had received a call from the apartment manager. The manager told dispatch that she had heard from a tenant that there was suspected drug use in an apartment where children also resided. Upon the officer's arrival at the complex, the manager flagged down the officers and explained that she received the information "a day or two before," but that "strange people" had been in the apartment that morning.

Upon approaching the apartment, the officers noticed that there were children's toys on the concrete patio outside the entrance. Officer Ludwig knocked on the front door and noticed there was "some give to the door." A second later, he knocked louder and more forcefully, and by doing so, pushed the door open. After a few second's pause at the threshold, Officer Ludwig entered the apartment and announced himself as police. An unnamed adult female walked through the first-floor hallway immediately to the left of entrance, and, upon questioning, informed Officer Ludwig that she did not live there. Officer Ludwig instructed her to stand with the second officer on the patio. Upon investigating the apartment, Officer Ludwig found one of the doors in the first-floor hallway was locked. He knocked on the door and, 20 seconds later, Maxim emerged and closed the door behind him.

Officer Ludwig instructed Maxim to put his hands on his head, and Maxim complied. Upon being asked whether he had anything illegal on him, Maxim started patting his pockets and said "I have a knife" and began to reach in his pocket. Immediately, Officer Ludwig instructed Maxim to return his hands to his head and Maxim obeyed. Affixing Maxim's hands atop Maxim's head with his left hand, Officer Ludwig led Maxim toward the apartment's entrance. Upon reaching the entryway, Officer Ludwig asked Maxim where the knife was located. Maxim said, "It's in my right pocket," and continued walking towards the front door. With his right hand, Officer Ludwig began to pat down Maxim's right pocket (while still affixing Maxim's hands to his head with his left hand) and Maxim continued walking. Officer Ludwig ordered Maxim to halt, and Maxim complied. Still holding his hands above his head, Officer Ludwig turned out Maxim's pocket with his right hand. After removing the knife and placing it on a foyer table, Officer Ludwig reached back and felt through the outturned pocket and removed a small, multicolored silicon container. Officer Ludwig would later testify that such containers, in his professional experience, often contain heroin. Before opening the container, Officer Ludwig

asked Maxim how much heroin the container held, and Maxim responded "It's not mine . . . I just picked it up off the table." Officer Ludwig placed Maxim in handcuffs, and sat him outside on the patio.

The officers searched the apartment, but no children were present, though children appeared to live there. The door that Maxim exited was locked, and no response came from within upon the officer's prompting. About a half hour after the officers entered the house, one of the children who lived at the apartment was dropped off by the school bus. Officer Ludwig placed Maxim in the back of a patrol vehicle, and, upon further questioning, Maxim revealed that he was on probation for grand theft and Officer Ludwig had dispatch run his name through the system. The search revealed that Maxim had outstanding warrants for failure to appear. Maxim allowed the officer to call the apartment owner on his cellphone, and she arrived shortly thereafter. She allowed the officers to unlock the hallway door with a screwdriver to reveal a bathroom. A second male was found hiding behind the shower curtain.

The State charged Maxim with felony possession of a controlled substance. Maxim promptly filed a motion to suppress "all evidence obtained as the result of an illegal, warrantless entry into [his] residence and/or an illegal pat-down." Maxim argued that there were no exigent circumstances to justify the officer's warrantless entry of the home because no facts demonstrated an imminent emergency. He also claimed that Officer Ludwig unlawfully frisked him because, despite admitting to possessing a knife in his pocket, the circumstances were insufficient for Officer Ludwig to reasonably believe that Maxim was armed and presently dangerous.

In response, the State asserted a number of alternative arguments. First, the State contended that Maxim did not have "standing" to object to the searches because he did not have a "reasonable or legitimate expectation of privacy in the area searched. . . ." To prove this, the State pointed out that Maxim denied living at the apartment when asked by Officer Ludwig and that he waived his Fourth Amendment rights under his terms of probation. Next, the State argued the officers did not need a warrant to search the apartment because they were performing their community-caretaking function. Lastly, the State argued that even if there were Fourth Amendment violations, the exclusionary rule need not apply because "the police would have utilized certain proper and predictable investigatory procedures; and . . . such procedures would have inevitably led to the discovery of the evidence . . . ."

Maxim responded by arguing that he lived at the apartment at the time of the search and that he was not required to have an ownership interest in the apartment to have a reasonable expectation of privacy. Maxim asserted that he retained Fourth Amendment standing because the officers were unaware of the waiver at the time of the alleged violations.

The district court held a hearing on the motion in late December 2017. At the hearing, Maxim testified that he had been living at the apartment for almost a month prior to his arrest. Officer Ludwig testified that he did not know of Maxim's probation status at the time he entered the apartment or frisked Maxim. At the hearing, the district court found that Maxim made a sufficient showing to shift the burden to the State. The district court took the rest of the issues under advisement. On January 30, 2018, the district court entered a written decision and order denying Maxim's motion and concluded that discovery of the heroin was inevitable. Since the discovery was inevitable and the exclusionary rule would not apply, the district court reasoned it was not necessary "to determine whether the actual entry and pat-down of Maxim were lawful" or to "analyze the effectiveness of Mr. Maxim's waiver unknown to the officers at the time."

Shortly thereafter, Maxim pleaded guilty to possession of heroin, reserving the right to appeal the denial of the motion to dismiss. He timely appealed.

## II.    ISSUES ON APPEAL

1. Can the existence of a Fourth Amendment waiver make an otherwise unreasonable search of a probationer's home reasonable even if the police were not aware of the waiver at the time of the search?

2. Did the district court err in finding that the evidence would have been inevitably discovered?

## III.    STANDARD OF REVIEW

When reviewing a decision on a motion to suppress, this Court "accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018) (quoting *State v. McNeely*, 162 Idaho 413, 414–15, 398 P.3d 146, 147–48 (2017)).

## IV.    ANALYSIS

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental

officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967)). "The Founding generation crafted the Fourth Amendment as a response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Id.* (citation omitted) (internal quotation marks omitted).

Determining whether government activity constitutes a "search" under the Fourth Amendment is an inquiry that has evolved with the times. In the early days, the search doctrine was "tied to common-law trespass," and asked whether the government "obtain[ed] information by physically intruding on a constitutionally protected area." *United States v. Jones*, 565 U.S. 400, 405, 406 n. 3 (2012). In recent times, the Supreme Court has established that "the Fourth Amendment protects people, not places," and *expanded* the concept of the Amendment to government violations of an "expectation of privacy" that "society is prepared to recognize as 'reasonable.'" *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Both historically and textually, a person's home is the centerpiece of the Amendment's constitutional protection. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018).

But even if a Fourth Amendment search has occurred, the Fourth Amendment only forbids *unreasonable* searches and seizures. As expressed in the Amendment's text, a search conducted without a warrant is presumptively unreasonable. *Id.* at 1670. But the United States Supreme Court and this Court have recognized certain exceptions to the Amendment's warrant requirement. *State v. Wulff*, 157 Idaho 416, 337 P.3d 575 (2014); *Illinois v. Rodriguez*, 497 U.S. 177 (1990). For example, consent may render a Fourth Amendment search reasonable. *Wulff*, 157 Idaho at 419, 337 P.3d at 578; *Rodriguez*, 497 U.S. at 181. This is true where a probationer has consented to a search by virtue of a term in a probation agreement. *See State v. Jaskowski*, 163 Idaho 257, 260, 409 P.3d 837, 840 (2018).

If a Fourth Amendment violation has taken place, then, generally speaking, a defendant may seek to have the court exclude evidence obtained by the unconstitutional police conduct. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). As the United States Supreme Court originally explained: "[T]he purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" *Id.* at 656. But the United States Supreme Court has also recognized circumstances

5

where the exclusionary rule need not apply, finding under the circumstances that the costs of exclusion outweigh the goals of deterrence. *Herring v. United States*, 555 U.S. 135, 137 (2009) ("Our cases establish that such suppression is not an automatic consequence of a Fourth Amendment violation. . . . the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct.").

As applied, a defendant bringing a motion to suppress must show that there was a Fourth Amendment search, that he has standing to challenge the search, and that the search was unreasonable. *State v. Hoskins*, 165 Idaho 217, 220–21, 443 P.3d 231, 234–35 (2019). If the defendant makes this showing—for example, by demonstrating a "search" which violated *his* Fourth Amendment rights and the absence of a warrant—then the burden will shift to the State to show an exception to the warrant requirement exists or that the search was reasonable under the circumstances. *Id.*

This case asks what happens when police unconstitutionally enter a home, frisk an individual, arrest him, and, only after all that, discover that the individual has signed a Fourth Amendment waiver as a condition of probation.

The State's answer is that no violation actually occurs. Under the State's view, once Maxim signed the Fourth Amendment waiver as a term of probation, he could no longer maintain a reasonable expectation of privacy as required to assert a Fourth Amendment violation. This, the State argues, is the "standing" requirement of the Fourth Amendment. Under this view, the State posits a scenario where, once a probationer has signed a Fourth Amendment waiver, no Fourth Amendment violation can ever occur, no matter how egregious the police conduct. As explained below, we cannot agree.

There are a few glitches in the State's proposed analysis. The State attempts to wedge Maxim's Fourth Amendment waiver into the "search" and "standing" components of the Fourth Amendment analysis, despite this Court's precedent holding that such waivers represent *consent* to searches and thus implicate the "reasonableness" component of the analysis.

First, we must correct the State's misinterpretation of Fourth Amendment standing. Standing in the Fourth Amendment context is used as shorthand for the question of whether the defendant *personally* has a reasonable expectation of privacy in the place searched. *See State v. Mann*, 162 Idaho 36, 39 n.1, 394 P.3d 79, 82 n.1 (2017). Originally, the term was used because Fourth Amendment rights, like almost all Constitutional rights, are personal. So, much like

6

Article III standing requires a plaintiff to have personally suffered an injury in order to bring a claim in federal court, a criminal defendant must show that *his* Fourth Amendment rights have been violated to claim the protection of the exclusionary rule. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018); *United States v. Salvucci*, 448 U.S. 83, 85 (1980) ("[D]efendants charged with . . . possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated."). Indeed, as indicated by the cases cited by the State, standing is most useful in contexts where third parties are implicated. *Minnesota v. Carter*, 525 U.S. 83, 85–91 (1998) (rejecting a defendant's argument that he could object to the search of an acquaintance's purse that he dumped drugs into moments before police arrived on the scene); *Rawlings v. Kentucky*, 448 U.S. 98, 100–06 (1980) (determining that two defendants could not object to the "search" of an apartment when the duo were only present in the apartment for the "business transaction" of packaging illegal drugs). Thus, the focus of Fourth Amendment standing centers on whether *the defendant's* Fourth Amendment rights were violated, not whether the defendant has a reasonable expectation of privacy. Here, Maxim quite clearly asserts his Fourth Amendment rights were violated. Indeed, the State concedes that Maxim lived at the apartment which was searched by the officers. Surely, a search and seizure of Maxim's person implicates his Fourth Amendment rights. Who else would those rights belong to?

Instead of Fourth Amendment standing, the State's arguments are better construed to assert that the police action in this case does not qualify as a "search" under the Fourth Amendment. Indeed, whether police activity constitutes a Fourth Amendment search is the question that engendered the "reasonable expectation of privacy" language. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). While there are various formulations of what constitutes a "search" under the Fourth Amendment, there is no question that a police officer entering into a home is a "search" under the Fourth Amendment: "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (citation and internal quotation marks omitted).

The State's argument overlooks that the concept of privacy announced in *Katz* exists *in addition to*, not in replacement of, the traditional property concept of searches. *Id.* at 5. So while the Fourth Amendment protects a broader "zone of privacy" than explicitly listed in the Amendment, that "zone" can be easily defined by the "the unambiguous physical dimensions of

an individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972) (citations omitted). So, "when it comes to the Fourth Amendment, the home is first among equals." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *Jardines*, 569 U.S. at 6). Indeed, "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton*, 445 U.S. at 589–90 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

As a result, the warrantless entry into a home is presumptively unreasonable. *State v. Maland*, 140 Idaho 817, 822, 103 P.3d 430, 435 (2004). This presumption may be overcome when the State proves an exception to the warrant requirement, such as consent or exigency. *State v. Wulff*, 157 Idaho 416, 419, 337 P.3d 575, 578 (2014). Such exceptions mean that the search would be "reasonable" and, therefore, not violate the Fourth Amendment. But to accept that no Fourth Amendment "search" occurs when police enter a private home without a warrant would so severely distort the Fourth Amendment as to render it unrecognizable.  Here, there is no dispute that the officers entered the apartment without a warrant or permission. The State thus bears the burden to show an exception to the warrant requirement.

This is where Maxim's Fourth Amendment waiver enters the analysis. Our case law on Fourth Amendment waivers has consistently and correctly viewed them under the rubric of *consent* to searches, and thus, affecting the reasonableness prong of the analysis:

> The common guiding principle underlying our decisions . . . is that courts evaluating the scope of the Fourth Amendment waiver must look to the language used in the condition of probation in order to determine *whether the search was objectively reasonable*.

*State v. Jaskowski*, 163 Idaho 257, 261, 409 P.3d 837, 841 (2018) (emphasis added). So, despite the State's insistence that Maxim's consent affects the "search" component of the analysis and not the "reasonableness" component, we cannot agree. Indeed, to parrot an observation from the late Supreme Court Justice Antonin Scalia: "To describe a consented search as a noninvasion of privacy and thus a non-search is strange in the extreme." *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

Thus, we must determine whether the officer's actions in this case were reasonable. To determine whether the officers' actions were reasonable, we look first to the language of the

Fourth Amendment waiver. *State v. Jaskowski*, 163 Idaho 257, 261, 409 P.3d 837, 841 (2018). Specifically, the State pointed out that Maxim had agreed to the following term:

> Search: I consent to the search of my person, residence, vehicle, personal property, and other real property or structures owned or leased by me, or for which I am the controlling authority conducted by any agent of [the Idaho Department of Correction] or a law enforcement officer. I hereby waive my rights under the Fourth Amendment and the Idaho constitution concerning searches.

The State is correct that this is a broad grant of consent. It is not conditioned on the "at the request of" language like that of *Jaskowski*. *See id.* Rather, it is like the language[1] in *State v. Gawron*, 112 Idaho 841, 843, 736 P.2d 1295, 1297 (1987). But these Fourth Amendment waivers do not eviscerate Fourth Amendment rights, they only tip the scales of the reasonableness analysis. In *Gawron*, this Court responded to the defendant's argument that such broad waivers are an unreasonable invasion of Fourth Amendment rights by recognizing that "such persons conditionally released to societies have a reduced expectation of privacy, thereby rendering intrusions by government authorities 'reasonable' which otherwise would be unreasonable or invalid under traditional constitutional concepts." *Id.* As a result, the State's suggestion that such a waiver categorically precludes a probationer from succeeding in a motion to suppress is incorrect. To be sure, the challenge is more difficult, but not impossible.

With this modified analysis in mind, we must look to the reasonableness of the government's actions considering "all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). In doing so, we freeze-frame the factual circumstances to focus on what the officers knew *at the time of the alleged violation. See id.* at 20 (determining whether police action was unreasonable by looking to whether "the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.").

Here, the determinative fact in this case is that the officers did not know about Maxim's Fourth Amendment waiver at the time of the alleged unconstitutional conduct. In fact, they did not even know that Maxim was in the apartment. At oral argument, the State conceded that the

---

[1] The term of probation at issue in *Gawron* provided:

> That probationer does hereby agree and consent to the search of his person, automobile, real property, and any other property at any time and at any place by any law enforcement officer, peace officer, or probation officer, and does waive his constitutional right to be free from such searches.

*State v. Gawron*, 112 Idaho 841, 842, 736 P.2d 1295, 1296 (1987)

9

officer's actions in entering the apartment were unreasonable, so it's puzzling how the discovery of a waiver retroactively makes the actions reasonable. Had the officers known that a probationer who signed a Fourth Amendment waiver resided at the apartment, this equation would surely be different. But the only question presented by these facts is whether the existence of a Fourth Amendment waiver can transform the officer's otherwise illegal actions into reasonable ones despite being unaware of the waiver at the time he acted.

We hold that a Fourth Amendment waiver cannot salvage an otherwise unreasonable entry into a home under the Fourth Amendment if the police officers were unaware of the waiver at the time of the unconstitutional search. We are not alone in this common-sense approach. *See Samson v. California*, 547 U.S. 843, 856 n.5 (2006) ("Under California precedent . . . an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee."); *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017) ("Police officers must know about a probationer's Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as a justification for the search."). The discovery of a Fourth Amendment waiver after the fact should not serve as a *deus ex machina* allowing the State to rewrite the story in the courtroom when the police's actions were unconstitutional outside of it. *See State v. Saldivar*, 165 Idaho 388, 393, 446 P.3d 446, 451 (2019) (noting that a similar argument by the State dealing with a parolee "is essentially a post hoc justification for the conduct of the police, based on information the police did not know at the time.")

Even if the officer's actions were unreasonable, the drug evidence could still be admissible under the inevitable-discovery exception to the exclusionary rule. *See Nix v. Williams*, 467 U.S. 431, 440–41 (1984). The United State Supreme Court has defined the inevitable-discovery doctrine based on a weakened deterrence ground: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444. "The premise is that law enforcement should be 'in the same, not a worse, position that they would have been' absent the misconduct." *State v. Downing*, 163 Idaho 26, 31, 407 P.3d 1285, 1290 (2017).

In *Nix v. Williams*, the United States Supreme Court held that evidence relating to the discovery of a murder victim's body could still be admissible despite Sixth Amendment

10

violations that helped lead to its discovery. 467 U.S. at 444. There, police officers picked up a murder suspect, and, in the process of transporting him, deliberately elicited incriminating statements in violation of his right to counsel. *Id.* at 436. The questioning resulted in the defendant leading the police officers to the body of his murder victim. *Id.* However, independent of those events, a search team was combing the same area because the victim's clothes had been discovered nearby. *Id.* The team was within a few miles of locating the body, but the search was halted once the defendant agreed to cooperate. *Id.*

The Supreme Court agreed with the lower courts that the evidence relating to the victim's body was not subject to the exclusionary rule despite the illegality of the interrogation, because the State had carried its burden to show that the evidence inevitably would have been discovered. *Id.* at 450. The search was undertaken five hours prior to the questioning, and was only suspended after the defendant agreed to cooperate with police. *Id.* at 449. The leader of the search testified that the search party would have searched the area where the body was found, was instructed to search culverts (which is where the body was hidden), and would have resumed its task if the defendant did not actually lead police to the body. *Id.* Based on this testimony, the Court was satisfied that the evidence would have inevitably been found. *Id.* at 450. Thus, excluding the evidence in such a situation would put the State in a worse position than it would have been in without the illegality. *Id.* at 447.

Here, if we put the police in the same position they would be in without the police misconduct, the police are left with no other investigatory wheels in motion. As we have stated on prior occasions, "the inevitable discovery exception does not permit us to speculate on the course of action the investigation could have taken in the absence of [the Constitutional violation]—even if that alternate course likely would have yielded the evidence." *Downing*, 163 Idaho at 32, 407 P.3d at 1291. A police investigation often takes branching paths. The inevitable-discovery doctrine presupposes parallel paths leading toward the inevitable discovery of evidence. If, because of illegal police action, one path arrives at the evidence before the other does, then the State will be permitted to prove that the existing alternative path would have yielded the evidence even if the existing alternative path was cut short due to the discovery of the evidence. However, the split in the investigation which creates these parallel paths must occur *prior to or independent of* the illegality, not because of it. The question is not what legal path the police would have inevitably taken which could have yielded the evidence. The question is what

legal path the police actually took which would have inevitably yielded the evidence. We again stress the astute observation of our Court of Appeals: "The inevitable discovery doctrine 'is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did.'" *Id.* (quoting *State v. Holman*, 109 Idaho 382, 392, 707 P.2d 493, 503 (Ct. App. 1985)) (internal quotation marks and alterations omitted).

The question becomes whether the State can prove that the evidence in question would have been inevitably discovered even if the police illegality is removed from the equation. The State did not meet this burden. Here, unlike *Nix*, there was no parallel path which would have led to the discovery of the evidence. There were no investigatory efforts aimed at Maxim. In addition, the district court's analysis relied in a large measure on prolonged timelines that could not have accounted for all the permutations of possible events. The district court reasoned that "if [the officers] had stayed outside the apartment and the occupants had ignored their requests to respond," the officers would not have abandoned their inquiry, and "the [apartment] owner would have eventually given consent for the officers to enter." The district court reasoned that because Maxim's girlfriend stated she was unaware Maxim was in her apartment, it is likely "had [she] been contacted before Mr. Maxim [was] found and arrested . . . she still would have permitted the police to enter and search the apartment before permitting her child to enter." Once in the apartment with the owner's consent, the officers would not have ignored a locked bathroom during their search, and would therefore have located Maxim. Having found him hiding "[a]fter a long suspicious wait for consent," they would have run his name through their system, found his arrest warrant, searched him, and discovered the heroin. In *Nix*, the evidence was found "within a short time" and in "essentially the same condition" as a result of the independent search. 467 U.S. at 438. Here, there is simply too much time and too many independent actors to presume that the officer would have found the evidence in a short period of time or in essentially the same condition. As a result, we determine that the district court erred by speculating about what the police could have done instead of what they did do.

## V.    CONCLUSION

We reverse the district court's order denying Maxim's motion to suppress. We hold that a Fourth Amendment waiver which is unknown to an officer at the time of a Fourth Amendment violation cannot be relied on to assert that the search was reasonable. We also determine that the district court misapplied the inevitable discovery doctrine by engaging in a speculative analysis

that did not rely on an investigative path set in motion prior to or independent of the unlawful police activity. We vacate the district court's judgment of conviction, reverse its denial of Maxim's motion to suppress, and remand for further proceedings consistent with opinion.

Justices STEGNER and MOELLER **CONCUR**.

BEVAN, Justice, dissenting in part.

This is a case about the proper scope of and the entitlement to the protections of the Fourth Amendment by a probationer who has explicitly "waiv[ed his] rights under the Fourth Amendment and the Idaho Constitution concerning searches." In my view, the proper legal standard for this case requires Maxim, as the defendant asserting his Fourth Amendment rights were violated, to *first* establish three things: "the defendant [1] 'must come forward with evidence sufficient to show there was a Fourth Amendment search, [2] [the defendant] has standing to challenge the search, and [3] the search was illegal.' " *State v. Hoskins*, 165 Idaho 217, 220–21, 443 P.3d 231, 234–35 (2019). Without a proper showing that Maxim has standing to challenge the search, the remaining merits of Maxim's claims, including the unreasonableness of the officers' conduct, is immaterial to the analysis of the Court. I would therefore affirm the district court's denial of the motion to suppress because Maxim lacks standing. The majority and I agree on the district court's inappropriate application of the inevitable discovery doctrine, but that analysis is unnecessary given my conclusion that Maxim lacks standing to assert a constitutional violation here.

To reiterate, as to Maxim's waiver of his constitutional rights, the probation agreement which he signed required two things of him, both *consent* to search and a *waiver* of his rights under the United States and Idaho constitutions:

> **<u>Search</u>**: I *consent* to the search of my person, residence, vehicle, personal property, and other real property or structures owned or leased by me, or for which I am the controlling authority conducted by any agent of IDOC of a law enforcement officer. I hereby *waive* my rights under the Fourth Amendment and the Idaho constitution concerning searches.

(Emphasis added).

We recently held that the "common guiding principle underlying our decisions in [these kinds of cases] is that courts evaluating the scope of the Fourth Amendment waiver must look to the language used in the condition of probation in order to determine whether the search was objectively reasonable." *State v. Jaskowski*, 163 Idaho 257, 261, 409 P.3d 837, 841 (2018). That common guiding principle requires that we view the clause as a whole and not evaluate the

reasonableness of the search before we determine whether Maxim has standing to assert his rights. *State v. Mann*, 162 Idaho 36, 41, 394 P.3d 79, 84 (2017) ("[E]ven if a search is unreasonable, a defendant must have a privacy interest that was invaded by the search in order to suppress evidence discovered in the search.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)). For example, in *Mann*, this Court held that an unauthorized driver of a rental car lacks standing to challenge a search of the rental car. *Mann*, 162 Idaho at 42, 394 P.3d at 85.When a search is challenged, the defendant bears the burden of showing that he or she had a reasonable expectation of privacy in the place searched. *Id.* (citation omitted); *see also State v. Bottelson*, 102 Idaho 90, 92, 625 P.2d 1093, 1095 (1981) ("[T]o claim the protection of the fourth amendment, a person must show that he had a legitimate expectation of privacy in the invaded place."). The majority gets the cart before the horse and conditions its Fourth Amendment analysis on whether the defendant's rights were violated, not whether the defendant held a reasonable expectation of privacy that society is willing to recognize as legitimate. I believe such an analytical paradigm is erroneous.

At issue is whether Maxim had standing to challenge the search. Standing is simply "shorthand for the question [of] whether the [defendant] had a legitimate expectation of privacy in the area that was searched." *Hoskins*, 165 Idaho at 221, 443 P.3d at 235 (quoting *Mann,* 162 Idaho at 44 n. 1, 394 P.3d at 87 n. 1). Whether a defendant has an expectation of privacy is a two part inquiry. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

> The first [question] is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"—whether . . . the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' "—whether . . . the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Id.* (citing *Katz v. United States*, 389 U.S. 347, 351–61 (1967) (internal citations omitted)).

Probationers have a reduced expectation of privacy. *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled."); *State v. Gawron*, 112 Idaho 841, 843, 736 P.2d 1295, 1297 (1987) ("[S]uch persons conditionally released to societies have a reduced expectation of privacy, thereby rendering intrusions by government authorities 'reasonable' which otherwise would be unreasonable or invalid under traditional constitutional concepts."). "Probation is simply one point . . . on a continuum of possible punishments ranging from solitary

confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). Many options lie between those two extremes like "probation—which can itself be more or less confining depending upon the number and severity of restrictions imposed." *Id*. "[I]t is always true of probationers . . . that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Id*. (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).

Whether Maxim's alleged privacy interest is "justifiable under the circumstances" is met with a "no" from me.

> [I]t must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law. . . . The recidivism rate of probationers is significantly higher than the general crime rate. . . . And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply. . . .

*Knights*, 534 U.S. at 120 (internal citations and quotations omitted).

The scope of probation is determined by the terms of the probation agreement. *See Jaskowski*, 163 Idaho at 261, 409 P.3d at 841 (explaining that resolution of these cases depends on the specific language of the waiver at issue). In *Gawron*, for example, the police had performed a warrantless search of Gawron's residence after learning Gawron was involved in multiple burglaries and it was revealed after a brief investigation that Gawron was on probation. *Id*. at 842, 736 P.2d at 1296. Gawron's probation agreement read:

> That probationer does hereby agree and consent to the search of his person, automobile, real property, and any other property at any time and at any place by any law enforcement officer, peace officer, or probation officer, and *does waive his constitutional right to be free from such searches.*

*Id*. (emphasis added). On appeal, Gawron argued the probation condition which required submission to warrantless searches was an unreasonable invasion of his Fourth Amendment rights. *Id*. This Court disagreed and held the reasonableness of the search need not be addressed because Gawron had expressly waived his constitutional right to be free from warrantless searches. *Id*. at 843, 736 P.2d at 1297. To compare, in *Jaskowski* an officer pulled Jaskowski over for an outstanding arrest warrant. *Id*. at 258, 409 P.3d at 838. Knowing Jaskowski was on

15

probation, the officer called his probation officer who later arrived at the stop. *Id*. The probation officer informed Jaskowski he would search the vehicle and then performed the search without Jaskowski's permission. *Id*. The terms of Jaskowski's probation agreement were:

> I shall submit and I agree to . . . warrantless searches of my person, personal property, electronic devices, automobiles, residence, and outbuildings *at the request of* my Probation Officer, by the Probation Officer, Peace Officer, and/or his designee; with or without Probable Cause; any time day or night. . . .

*Id*. (emphasis added). This Court challenged the State's expansive reading of *Gawron* that a probation condition on warrantless searches is always a complete waiver of Fourth Amendment rights, regardless of the actual language in the probation condition. *Id*. at 259, 409 P.3d at 839. Rather, this Court explained "[i]t is well settled that when the basis for a search is consent, the state must conform its search to the limitations placed upon the right granted by the consent." *Id*. at 260, 409 P.3d at 840 (quoting *State v. Turek*, 150 Idaho 745, 749, 250 P.3d 796, 800 (Ct. App. 2011)). This Court then held the warrantless search of Jaskowski's vehicle exceeded the scope of his Fourth Amendment waiver because Jaskowski's waiver "was conditioned upon the probation officer requesting to conduct a search and that any search conducted without such a prefatory request is not objectively reasonable." *Id*.

The majority mistakenly reads our precedent in this arena as representing that a probationer's waiver must at first be analyzed for its reasonableness under the Fourth Amendment. That said, our cases hold that the scope of a Fourth Amendment waiver depends on the terms of the probation agreement. This Court has not ignored the standing question in these types of cases, and our appellate courts have even allowed the issue to be raised for the first time on appeal. *E.g.*, *State v. Hanson*, 142 Idaho 711, 718, 132 P.3d 468, 475 (Ct. App. 2006). Indeed, a court may find sua sponte that the defendant has not shown standing, no matter if the prosecutor brought this flaw to the court's attention. *See United States v. Nadler,* 698 F.2d 995, 998 (9th Cir.1983).

*Gawron* and *Jaskowski* are just two examples of different points on the continuum of possible probation punishments. *See Knights*, 534 U.S. at 119. If a waiver includes limiting language such as the "at the request of" language employed in *Jaskowski*, then the scope of the waiver is less intrusive and the probationer reserves some expectation of privacy, albeit a limited one. On the other hand, if the waiver includes no limiting language such as the language in *Gawron* that waived all Fourth Amendment rights, the probationer has no reasonable expectation

of privacy. This is precisely the type of language that governs this case. *See Samson v. California*, 547 U.S. 843, 852 (2006) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972) ("[P]ertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' . . . including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate.").

I recognize the majority's concern over the potential "evisceration" of the Fourth Amendment carries some weight. Yet given the recognized societal risk that probationers pose, I submit that probationers' expectations of privacy are appropriately limited by the *language* employed in the waiver itself. *See Jaskowski*, 163 Idaho at 260, 409 P.3d at 840. The language in the waiver clause is broad for a reason, and it is not for this Court to rewrite it now under the guise of a reasonableness analysis. Indeed, if the majority harbors concerns about the breadth of the waiver clause, the better solution could be to challenge the voluntariness of such a waiver. *See Gawron*, 112 Idaho at 844, 736 P.3d at 1298 (Bistline, J., dissenting) (quoting *State v. Fogarty*, 610 P.2d 140 (Mont. 1980) ("A waiver theory however, does not comport with the requirements . . . that a waiver is invalid unless it be made knowingly, intelligently, and voluntarily. A choice cannot be termed voluntary where the alternative is prison and even more restrictions). That said, Maxim has not raised the voluntariness of his waiver on appeal, and thus that issue is not before us.

The unstated truth is that the Fourth Amendment is alive and well for ordinary citizens who are not on probation for criminal behaviors which cause them to lose a panoply of constitutional rights. *See* Idaho Const. art. VI, § 3 ("No person is permitted to vote, serve as a juror, or hold any civil office who has, at any place, been convicted of a felony. . . ."); Idaho Code § 18-3316 (a person convicted of a felony loses their rights under the Second Amendment to keep and bear arms). Society as a whole has an interest that must be weighed in these equations. "In assessing the governmental interest side of the balance, it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' " *Knights*, 534 U.S. at 120 (quoting *Griffin,* 483 U.S. at 880). The majority's basis for distinguishing this case from others where we have upheld the waiver–*Gawron*, *Purdum* and *State v. Garnett*, No. 45282, 2019 WL 2416953, at *2 (Idaho June 10, 2019)—is that in those cases law enforcement knew about the probationer's status at the time of the search. My problem with relying on the officer's knowledge or lack thereof as the

basis for a rule of constitutional law in cases like this one is that it wholly ignores the primary question whether the *probationer* had a reasonable expectation of privacy that society recognizes as legitimate in the first place. The potential evisceration of the Fourth Amendment is of no moment where the probationer has no such reasonable expectation of privacy to begin with.

Based on the refined precedent of this Court, Maxim reserved no expectation of privacy when he waived all of his rights under the Fourth Amendment. Absent from the waiver is any limiting language such as the need to request to search that was present in *Jaskowski*. Maxim cannot create a subjective expectation of privacy when he explicitly waived his Fourth Amendment rights to search his property. Even assuming Maxim had a subjective expectation of privacy, to have standing Maxim must also show his expectation is "one that society is prepared to recognize as reasonable." *Maryland*, 442 U.S. at 740. Society is not prepared to recognize a probationer's subjective privacy belief where the probationer expressly waives all of his rights under the Fourth Amendment. *See Samson*, 547 U.S. at 852. Based on Maxim's complete waiver of his Fourth Amendment rights, he has failed to show he has a reasonable expectation of privacy in his person or the place to be searched. Thus, he lacks standing to assert any rights under the Fourth Amendment. For that reason, I respectfully dissent.

Justice BRODY concurs.