# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45062

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | **Boise, August 2018 Term** |
| | ) | |
| v. | ) | **Opinion filed: June 12, 2019** |
| | ) | |
| PETER O'DONALD CLARKE, | ) | **Karel A. Lehrman, Clerk** |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County, John T. Mitchell, District Judge.

The judgment of the district court is <u>vacated</u>.

State Appellate Public Defender's office, Boise, for appellant. Jenevieve C. Swinford argued.

Idaho Attorney General's office, Boise, for respondent. Theodore Tollefson argued.

―――――――――――

HORTON, Justice.

Peter O'Donald Clarke ("Clarke") appeals from his judgment of conviction, entered upon a jury verdict finding him guilty of possession of methamphetamine, marijuana, and paraphernalia. The methamphetamine, marijuana, and paraphernalia were all found on him during a search incident to arrest for misdemeanor battery.

On appeal, Clarke argues that the district court erred when it denied his motion to suppress. Clarke contends his arrest for the misdemeanor was unlawful because it had been committed outside of the officer's presence; and thus the arrest violated the constitutions of the United States and Idaho. Clarke also alleges prosecutorial misconduct during closing argument. For the following reasons, we vacate Clarke's judgment of conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:45 p.m. on August 1, 2016, a young woman, Taylor Dan ("Dan"),

1

flagged down a Kootenai County Deputy Sheriff (Michael Hanson) near Honeysuckle Beach in Hayden, Idaho. Dan reported that she had been harassed and groped by a man earlier in the day while trying to enjoy the beach with her young son. She reported she had been sitting on the beach with her son when she was approached by a man unknown to her. The man appeared to her to be intoxicated. She felt uncomfortable and had to keep moving away from him. The man made unwanted personal advances, calling her "hot" and "fine." Despite telling the man she was married and not interested in speaking to him, the man persisted. He sat down next to her and eventually grabbed her "butt." Dan told the man "don't touch me" and "stop," but he did it a second time. The man, who was later identified as Clarke, then asked her to call his lost cell phone so he could locate it. Dan called Clarke's cell phone and then left with her son. Soon after leaving, Dan received a harassing text message from Clarke. (Dan deleted the text message upon its receipt.) After giving the deputy a description of Clarke,[1] Dan advised the deputy she wished to press charges.

Deputy Hanson, within a short time of speaking to Dan, located Clarke. Clarke admitted to talking to Dan and to grabbing her butt in the way Dan had described; however, he maintained the touching was consensual.

Based on Dan's complaint and Clarke's confirmation that the described touching had occurred, Deputy Hanson arrested Clarke for misdemeanor battery. Clarke was searched incident to his arrest. Deputy Hanson, in conducting a search of Clarke's backpack, uncovered syringes, a baggy containing marijuana, and a baggy containing several small chunks of a white crystalline substance, later identified as methamphetamine. In addition, when Clarke was being booked into the Kootenai County jail, a partially filled syringe containing a white substance, later identified as methamphetamine, was found in Clarke's right shoe.

Clarke was charged with felony possession of a controlled substance and bound over to district court following a preliminary hearing. Clarke moved to suppress the evidence obtained following his warrantless arrest. Soon thereafter, Clarke was charged by Information with felony possession of methamphetamine, misdemeanor possession of marijuana, misdemeanor possession of paraphernalia, and misdemeanor battery (the latter being the charge that resulted in

---

[1] Dan described Clarke as "a black male with a beard, approximately 30 to 40 years old, wearing a muscle shirt, an orange shirt, and black shorts with a black backpack and carrying a brown sack."

his arrest).

Clarke pursued his motion to suppress. He alleged there was neither a constitutional nor a statutory basis upon which he could have been arrested; so, as a result, his arrest had been unlawful. If his arrest were unlawful, the contraband obtained in the search incident to arrest would be "fruit of the poisonous tree" and therefore subject to suppression.[2]

The district court conducted a hearing on Clarke's motion. Following testimony from Deputy Hanson and Clarke, the district court found that probable cause existed for Clarke's arrest. The district court also found the arrest permissible under both of the applicable constitutional provisions (U.S. Const. amend. IV and Idaho Const. art. 1, § 17) and under the applicable Idaho statute, Idaho Code section 19-603(6).

The case proceeded to trial. Shortly before trial, the State dismissed the battery charge for lack of evidence. Clarke was tried on the remaining charges. A jury convicted him of felony possession of a controlled substance (methamphetamine), misdemeanor possession of a controlled substance (marijuana), and misdemeanor possession of drug paraphernalia. Clarke appeals, alleging the district judge erred in denying his motion to suppress and that the deputy prosecutor engaged in misconduct during closing argument that resulted in an unfair trial.

Clarke's appeal advances claims that his arrest for a misdemeanor committed outside the presence of the officer was unconstitutional under both the federal and state constitutions and that the prosecutor's comments during closing argument constituted prosecutorial misconduct. Because we find Clarke's constitutional argument to be dispositive, we do not reach his remaining arguments.

## II.    STANDARD OF REVIEW

"In reviewing a district court order granting or denying a motion to suppress evidence, the standard of review is bifurcated." *State v. Draper*, 151 Idaho 576, 592, 261 P.3d 853, 869 (2011). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *Id*. "However, this Court freely reviews the trial court's application of constitutional principles in light of the facts found." *Id*.

---

[2] "Fruit of the poisonous tree" is a legal metaphor meaning that evidence is inadmissible in court if the evidence was derived from evidence that was illegally obtained. *Segura v. United States*, 468 U.S. 796, 801 (1984); *accord, e.g.*, *State v. Bishop*, 146 Idaho 804, 810–11, 2013 P.3d 1203, 1209–10 (2009). In other words, if the source of the evidence (the tree) is poisonous, so is its fruit. *See id.*

### III. ANALYSIS

The dispositive issue in this appeal is whether a police officer violates Article I, Section 17 of the Idaho Constitution by making an arrest for a misdemeanor offense that occurred outside his presence but for which probable cause exists.

Article I, Section 17 of the Idaho Constitution has long been interpreted in conjunction with Idaho Code section 19-603 and its predecessor statutes, which were in place at the time of the adoption of the Idaho Constitution. *See State v. Green*, 158 Idaho 884, 888, 354 P.3d 446, 450 (2015). This statute articulates the bases upon which an arrest may be made in this state. Until 1979, the interpretation of the Constitution and the statutes that preceded Idaho Code section 19-603 largely echoed the general rule of federal cases — that a warrantless arrest was lawful if the arresting officer had probable cause to believe a felony had been committed or if the offender had committed a misdemeanor in the presence of the officer. *Id.*; *State v. Polson*, 81 Idaho 147, 152, 339 P.2d 510, 513 (1959) (officer may arrest a person if he has probable cause to believe that person committed a felony); *State v. Conant*, 143 Idaho 797, 799–800, 153 P.3d, 477, 479–80 (2007) (officer may make a warrantless arrest when a person has committed a public offense in the presence of a peace officer.)

In 1979, subsection 6 was added to Idaho Code section 19-603[3] and since then, the constitutional standard and the statutory standard have diverged. Subsection 6, from its inception, allowed the warrantless arrest of a person when there was reasonable cause to believe he had committed a misdemeanor assault or battery outside the presence of the officer, e.g., in a domestic violence situation. *See State v. Julian*, 129 Idaho 133, 141, 922 P.2d 1059, 1067 (1996) (Walters, J., special concurrence). The language in section 19-603(6) has been amended several times, but each modification has kept the original intent — that when there is probable cause[4] to believe certain misdemeanors have been committed outside the presence of an officer, a warrantless arrest is nevertheless lawful.[5]

---

[3] 1979 Idaho Sess. Laws 832.

[4] Although the language in the various iterations has changed from "reasonable cause" to "probable cause," those phrases are understood to have the same meaning. *See Julian*, 129 Idaho at 136, 922 P.2d at 1062; *see also* Ch. 307, § 1, 1979 Sess. Laws 832; Ch. 318, § 1, 1994 Sess. Laws 1019, 1019–20; Ch. 89, § 1, 1997 Sess. Laws 214, 214–15; Ch. 314, § 4, 1997 Sess. Laws 929, 930–31; Ch. 337, § 5, 2004 Sess. Laws 1007, 1010.

[5] In the proceedings before the district court, Clarke argued that section 19-603(6) had been violated by Deputy Hanson's arrest of him. The district court rejected Clarke's argument. Clarke has not appealed this finding.

Clarke argues that the statute limiting warrantless misdemeanor arrests to those committed in the officer's presence in effect at the adoption of the Idaho Constitution, as well as Idaho case law since its adoption, prohibits a warrantless arrest for what he describes as a completed misdemeanor.[6] As declared by this Court in *Green*, the statute governing warrantless arrests in effect at the time the Idaho Constitution was adopted was in "Title III, Chapter V, Section 7540 of the Idaho Revised Statutes" — a predecessor statute to Idaho Code section 19-603 which stated the usual rule of misdemeanor arrests, without subsection (6) or (7). *Green*, 158 Idaho at 888, 354 P.3d at 450.

Based on language in *Green*, Clarke argues that the statute at the time of the adoption of the Idaho Constitution was incorporated into the Constitution, and should be viewed as part of it. In *Green*, this Court declared:

> Provisions of the Idaho Constitution must be construed in light of the law prior to their adoption. Because the constitutional guarantee against unreasonable seizure of the person includes an arrest, the Idaho Constitution *incorporated the principles regarding arrest in the Idaho statutory and common law in 1890 when the constitution was adopted.*

*Id.* (internal citations omitted) (italics added).

Recently, in *Green*, this Court interpreted Idaho Code sections 19-603(6) and (7) and explained their relationship to Article I, Section 17 of the Idaho Constitution: "[b]ecause these subsequently enacted arrest standards did not exist at the time the Idaho Constitution was adopted, and because they were not incorporated by constitutional amendment, they cannot be considered part of the *constitutional* standard for what constitutes a reasonable seizure of the person." *Green*, 158 Idaho at 888–89, 354 P.3d at 450–51 (italics in original). As a corollary, *Green* held "[b]ecause the constitutional guarantee against unreasonable seizure of the person includes an arrest, the Idaho Constitution incorporated the principles regarding arrest in the Idaho statutory and common law in 1890 when the constitution was adopted." *Id.* at 888.

However, we conclude that this statement in *Green* is overbroad. *Green* should stand for the principle that preexisting statutes and the common law may be used to help inform our

---

Consequently, we take it as an accomplished fact that Clarke's arrest complied with Idaho's applicable statute. However, that does not end the inquiry. As *Green* teaches, there can be a divergence between what is, or is not, authorized by statute and what is, or is not, allowed by Idaho's Constitution.

[6] A completed misdemeanor is one which is no longer in progress when the officer arrives on the scene.

interpretation of the Idaho Constitution, but they are not the embodiment of, nor are they incorporated within, the Constitution. To hold otherwise would elevate statutes and the common law that predate the Constitution's adoption to constitutional status.

When construing the Idaho Constitution, "the primary object is to determine the intent of the framers." *Idaho Press Club, Inc. v. State Legislature*, 142 Idaho 640, 642, 132 P.3d 397, 399 (2006) (quoting *Williams v. State Legislature,* 111 Idaho 156, 158–59, 722 P.2d 465, 467–68 (1986)). The best resource is the compilation of the Proceedings and Debates of the Constitutional Convention of Idaho 1889 (I.W. Hart ed., 1912). Unfortunately, Article I, section 17 was adopted without debate. In the absence of the words of the framers, rights guaranteed by the state constitution are "examined in light of the practices at common law and the statutes of Idaho when our constitution was adopted and approved by the citizens of Idaho." *State v. Creech*, 105 Idaho 362, 392, 670 P.2d 463, 493 (1983). This Court has long taken this approach to interpreting our state constitution. *See, e.g., Toncray v. Budge*, 14 Idaho 621, 647, 95 P. 26, 34–35 (1908) ("We must now determine the meaning of the language used in [Art. 6, § 3 of the Idaho Constitution] in the light of conditions as they existed, at the time the constitutional convention was in session, in July, 1889.")

We have explained the significance of case law and statutes existing in 1889 as follows: "Because many of the delegates to the Constitutional Convention were outstanding lawyers in their day, we generally presume that they knew and acted on such prior and contemporaneous interpretations of constitutional words which they used." *Paulson v. Minidoka Cnty. Sch. Dist. No. 331*, 93 Idaho 469, 472 n.3, 463 P.2d 935, 938 n.3 (1970) (citing *Higer v. Hansen*, 67 Idaho 45, 62, 170 P.2d 411, 422 (1946)). Thus, a review of the common law is in order.

Blackstone explained:

The constable … hath great original and inherent authority with regard to arrests. He may, without warrant, arrest any one for a breach of the peace, and carry him before a justice of the peace. And, in case of felony actually committed, or a dangerous wounding whereby felony is like to ensue, he may upon probable suspicion arrest the felon. . . .

4 W. Blackstone, Commentaries *289 (1765).

By 1883, a scholar of the common law wrote:

There were, and, indeed, still are a good many differences of the considerable importance in the procedure relating to the prosecution of felonies and misdemeanours respectively. The most important are, that *as a rule a person*

6

*cannot be arrested for [a] misdemeanour without a warrant;* that a person committed for trial for a misdemeanor is entitled to be bailed (speaking generally), whereas a person accused of felony is not; and that on a trial for felony the prisoner is entitled to twenty peremptory challenges, whereas upon a trial for misdemeanour he is entitled to none.

Stephen, *History of the Criminal Law of England*, 193 (1883) (emphasis added).

The common law, as it developed throughout the United States prior to 1889, appears to have been unanimous in agreement with that articulated above. *See Commonwealth v. McLaughlin*, 66 Mass. (12 Cush.) 615, 618 (1853) ("Peace officers may, without warrant, arrest a party whom they have reasonable ground to suspect of having committed a felony. But a peace officer cannot arrest one without warrant, who is suspected of having committed a crime, not a felony."); *Butolph v. Blust*, 41 How. Pr. 481, 489–90 (N.Y. Gen. Term. 1871); *Jamison v. Gaernett*, 73 Ky. (10 Bush) 221, 225–26 (1874); *Quinn v. Heisel*, 40 Mich. 576, 578 (1879) (That officers "have a right to [warrantless] arrest for breaches of the peace committed in their presence is conceded by all. It is equally clear that they cannot arrest for a past offense, not a felony, upon information or suspicion thereof. . . ."); *Taaffe v. Slevin*, 11 Mo. App. 507, 513 (1882) ("[A] peace officer has no common-law power to arrest without a warrant, on mere suspicion of a misdemeanor, although he may do so for a breach of the peace, or misdemeanor less than a felony, committed in his presence."); *Robison v. Miner [People ex. rel. Robison v. Haug]*, 37 N.W. 21, 25 (Mich. 1888) ("no arrest can be made without warrant except in cases of felony or in cases of breaches of the peace committed in the presence of the arresting officer."), overruled on other grounds by *Burroughs v. Eastman,* 101 Mich. 419, 59 N.W. 817 (1894); *Pinkerton v. Verberg*, 44 N.W. 579, 582–83 (Mich. 1889) ("Any law which would place the keeping and safe conduct of another in the hands of even a conservator of the peace, unless for some breach of the peace committed in his presence, or upon suspicion of felony, would be most oppressive and unjust, and destroy all the rights which our constitution guaranties.").

Our research has failed to uncover any decision from a sister state prior to our State's constitutional convention which held that a peace officer could make a warrantless arrest for an offense committed outside his presence. The earliest such case that we have been able to locate was decided in 1895. That case, *Baltimore & O.R. Co. v. Cain*, 31 A. 801 (Md. 1895), presented a unique set of facts. There, the plaintiff sued the railway company for false imprisonment. *Id*. at 802. The plaintiff and three companions were intoxicated when they boarded a train. *Id*. Despite

the conductor's pleas that they desist, the party then "cursed and swore and drank liquor openly" in the presence of female passengers. *Id*. When the conductor told them that they would be removed from the train, they threatened him with violence. *Id*. The conductor then telegraphed ahead for an officer to arrest the plaintiff. *Id*. at 803. Following his arrest, the plaintiff paid a fine for his disorderly conduct. *Id*. at 804.

The court rejected plaintiff's claim, observing: "The plaintiff's first prayer ought to have been rejected. Its fallacy lies in the postulate that an arrest for a breach of the peace, committed out of the view of a peace officer, necessarily could not be legally made without a warrant." *Id*. at 805. The court's rationale would today fall under the rubric of "exigent circumstances." The court explained: "[t]he right of a person not an officer to make an arrest is not confined to cases of felony, for he may take into custody, without a warrant, one who in his presence is guilty of an affray or a breach of the peace. *Id*. at 803. The court continued:

> it was clearly lawful, under these conditions, for the conductor to expel him and his drunken companions from the train if he had a sufficient force to overcome their threatened resistance, or else to arrest them all without warrant, and then deliver them to the first peace officer he could procure within a reasonable time. If this were not so, then, as said by Lord Chief Justice Denman in *Webster v. Watts*, [63 E. C. L. 311], "the peace of all the world would be in jeopardy." And it would be in jeopardy, because if, in such and similar instances, no arrest could be lawfully made without a warrant, the culprit, "if transient and unknown, would escape altogether," before a warrant could be obtained (*Mitchell v. Lemon*, 34 Md. [176,] 181 [(1871)]), and there would soon cease to be any order or any security or protection afforded the public on swiftly-moving railroad trains, or even elsewhere, unless a peace officer were constantly present. The delay necessarily incident to obtaining a warrant would be in many, if not in most, cases of this and a kindred character equivalent to an absolute immunity from arrest and punishment; and, should the name of the offender be unknown, he, most probably, would never be apprehended if once suffered to depart. The law is not so impotent and ineffective as that. Being physically unable to expel these alleged riotous persons from the train, the conductor telegraphed for a peace officer, and without delay, and while the plaintiff was still drunk, caused his arrest the instant the officer thus summoned came in view of the plaintiff. If, then, any bystander could, in the language of Baron Parke, "for the sake of the preservation of the peace, * * * restrain the liberty of him whom he sees breaking" the peace, the act of the conductor in telegraphing for the policeman, and within a short space of time thereafter handing the plaintiff over to the officer, was in no respect different from a formal arrest of the plaintiff by the conductor, in the midst of the riot and disorder, and the prompt delivery of him afterwards to the officer. If the plaintiff was not in fact arrested by the conductor because of the presence of superior

resisting force, that fact cannot make the subsequent act of the conductor in pointing out the plaintiff to the officer wrongful or illegal.

*Id*. at 804.[7]

Notwithstanding this change in the common law of Maryland, two decades after our constitutional convention, the United States Supreme Court continued to recognize the traditional common law rule in *John Bad Elk v. United States*, 177 U.S. 529 (1900), stating that "an officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence." *Id*. at 534.

In 1915, this Court was given the opportunity to address the issue in *State v. Mox Mox*, 28 Idaho 176, 152 P. 802 (1915), and we implicitly continued to apply the common law rule. There, the defendant complained that a jury instruction "assumes that a person may be arrested without a warrant for a past misdemeanor not committed in the presence of the officer performing the arrest." *Id*. at  182 , 152 P. at 804. The Court rejected the contention, explaining that the jury instruction:

> does not assume the law to be that a person may be legally arrested without a warrant for a past misdemeanor not committed in the presence of the officer performing the arrest, but it tends to instruct the jury that, if the constable had reasonable cause to believe appellant was committing, or was about to commit, a crime, it was his duty, without a warrant, to endeavor to prevent him from committing it, and to arrest him, even though he had completed the offense before he could be prevented from so doing.

*Id*. at 183, 152 P. at 804.

In light of the foregoing, based upon the state of the common law in 1889, we conclude that the framers of the Idaho Constitution understood that Article I, section 17 prohibited warrantless arrests for completed misdemeanors.

We are fully mindful of the significance of this conclusion. "Domestic violence is a serious crime that causes substantial damage to victims and children, as well as to the community." I.C. § 32-1408(1). Idaho Code section 19-603(6) permits peace officers to use their arrest powers to intervene in domestic violence situations, even though they have not personally observed the commission of a crime, and to thereby defuse potentially violent circumstances.

---

[7] Similar considerations appear to have motivated the Legislature to enact Idaho Code section 19-603(7).

Nevertheless, the extremely powerful policy considerations which support upholding Idaho Code section 19-603(6) must yield to the requirements of the Idaho Constitution. For this reason, we vacate Clarke's judgment of conviction. In light of this decision, we do not reach Clarke's remaining claims of error.

## IV.    CONCLUSION

We vacate Clarke's judgment of conviction.

Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**