# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49269

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, January 2024 Term |
| | ) | |
| v. | ) | Opinion filed: June 27, 2024 |
| | ) | |
| BENNY DEAN CAMPBELL, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Derrick J. O'Neill, District Judge.

The judgment of the district court is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Ben McGreevy argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kale Gans argued.

_____

MOELLER, Justice.

After defendant Benny Dean Campbell was detained in handcuffs by law enforcement while investigating a stolen motorcycle, a police trooper discovered heroin and methamphetamine in Campbell's backpack. Campbell was charged with two felony counts for drug trafficking and possession of a controlled substance, and two misdemeanor counts for possession of a controlled substance and possession of drug paraphernalia. Campbell filed a motion to suppress the evidence, arguing that by initially placing him in handcuffs, the trooper converted his detention into an unlawful seizure under the Fourth Amendment to the United States Constitution. The district court agreed, concluding that Campbell's detention was a de facto arrest; however, the court also determined that the evidence was admissible under the attenuation doctrine.[1] *State v. Fenton*, 163 Idaho 318, 413 P.3d 419 (Ct. App. 2017). After the court denied his motion, Campbell entered into

---

[1] The decision to deny the motion to suppress was entered by Darla Williamson, Senior District Judge. Judge Derrick J. O'Neill, District Judge, is listed as the presiding judge in the caption because he presided over Campbell's subsequent proceedings and signed the judgment of conviction.

1

a conditional plea agreement that preserved his right to appeal the denied motion. On appeal, he asks this Court to reject the federal attenuation doctrine because Article I, section 17 of the Idaho Constitution affords him greater protections than the federal standard and is incompatible with Idaho's more expansive exclusionary rule. For the following reasons, we affirm the order of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:00 a.m. on November 6, 2020, Trooper Andrew D. Weinstein of the Idaho State Police ("the trooper") was driving through what he described as a "high crime area" in Boise, Idaho. He saw two individuals—a male and female—standing near two motorcycles in the parking lot of a hotel. Neither motorcycle had license plates. Both individuals had backpacks and carried motorcycle helmets, and soon walked away towards a nearby gas station. The trooper drove back by the motorcycles and confirmed that both were missing license plates and one of the motorcycles had been spray painted blue. The trooper found this suspicious "given the otherwise nice condition of the motorcycle." On running the visible VIN on the spray-painted motorcycle through dispatch, the trooper learned that it was a stolen vehicle from Nampa that was originally painted green.

The trooper drove to the gas station where he located the two individuals he saw earlier. At this time, backup was on the way. The male and female were standing near the front counter of the station's convenience store with their backpacks and motorcycle helmets. The trooper walked into the store and immediately told both individuals to get down on the ground. His gun remained holstered. The individuals complied, moving to the ground, and lying on their stomachs. The woman asked what was going on. The trooper informed them that one of the motorcycles they were standing next to earlier was stolen. The woman claimed it was hers, having obtained it from a storage unit she purchased. The man stated it was not his.

The trooper had the woman stand up and remove her backpack. He then placed her in handcuffs. The trooper then had the man set his backpack down before placing him in handcuffs. As the trooper escorted both individuals out of the store, backup from the Boise Police Department arrived on scene.

At his patrol car, the trooper patted down the female. He found a loaded handgun magazine in her pocket. The female told the trooper that her handgun was in her backpack. He retrieved their

2

items from the convenience store. He also patted down the male for contraband and nothing was found. The trooper then placed them both in his patrol car.

The male identified himself as Benny Dean Campbell while the woman identified herself as Kaycee Noel Suitter. Another Idaho State Police trooper arrived on scene and ran the second motorcycle's VIN. It came back clear. On running Campbell and Suitter's names through dispatch, the trooper learned that Campbell was on probation. At this point, ten minutes had elapsed since the trooper's first contact with Campbell in the convenience store.

Campbell began to dry heave while Suitter told the trooper that she obtained the motorcycle from a storage unit she purchased. She explained that she had never checked the VIN but had spray painted the bike blue because she disliked its former color. The trooper asked Campbell if he was on probation, and Campbell confirmed that he was. Campbell continued dry heaving, so the trooper removed him from the patrol vehicle. While Boise Police watched Campbell at the curb, the trooper searched Suitter's backpack and found a handgun. Boise Police then informed the trooper that Campbell was claiming to be a confidential informant for Bonner County.

The trooper called the Idaho Department of Correction to inform it of the situation. He learned that Campbell had signed a Fourth Amendment waiver. The probation officer on the line said she would need to contact Campbell's officer to confirm whether he was an informant for Bonner County, as he claimed. However, on learning that Suitter had a handgun, the probation officer authorized the trooper to search Campbell's backpack, where he found a black bag containing 112.7 grams of methamphetamine, 15.9 grams of heroin, a blue silicone pipe with brown residue, a scale, fentanyl, and syringes. Campbell was charged with two felonies for trafficking in heroin and methamphetamine, as well as a misdemeanor charge for possession of drug paraphernalia.

Campbell filed a motion to suppress the evidence from the search of his backpack, asserting that his "Fourth Amendment and Article I, § 17 rights were violated when the police stopped him without reasonable, articulable suspicion, effectuated a de facto arrest, and continued to hold him against his will." The parties briefed their arguments, and the district court held a hearing on the motion on June 2, 2021. The trooper testified at the suppression hearing. He explained that he is POST-certified and had been working as a trooper for the Idaho State Police for four years. The trooper stated that the area he was in on November 6, 2020, is a high-crime area he frequently patrolled. He also explained that his observations on the night in question were detailed in his

report, and explained that felony stops carry a "higher risk" to officer safety. After establishing the events of Campbell's detention, and hearing arguments from the parties on whether there was a de facto arrest, the district court raised questions on whether an exception to the exclusionary rule could still permit the evidence to be admitted even if there was an unreasonable seizure. Following the hearing, the district court requested additional briefing on the attenuation doctrine.

After reviewing the briefing, the district court issued a written decision denying Campbell's motion to suppress the evidence. It concluded that, although "Trooper Weinstein was authorized to conduct an investigative detention of [Campbell] and his female companion, to determine their involvement in the theft of the motorcycle," he lacked probable cause to make a de facto arrest by putting Campbell in handcuffs. The district court explained: "the [S]tate presented no evidence during the suppression hearing that the trooper's safety was threatened in any way by the defendant or his female companion and there was nothing known about the theft of the motorcycle that would cause it to be considered violent crime." Additionally, because the trooper did not know Campbell was on probation at the time he was placed in handcuffs, the court determined that Campbell's Fourth Amendment waiver did not authorize an arrest where there were no obvious officer safety or flight issues at risk. On this point, the district court added a footnote to its decision, stating: "The inevitable discovery doctrine also does not assist the State here since there is no indication that there was a parallel path by which the drug evidence would have been discovered, apart from Trooper Weinstein's encounter with the defendant."

While acknowledging that these factors "favor[ed] suppression," the district court determined that the evidence was still admissible under the attenuation doctrine, which permits evidence where the "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff*, 579 U.S. 232, 238 (2016). The court determined that while there was temporal proximity between the purported de facto arrest and discovery of the evidence, there was the intervening circumstance of discovering Campbell's probation status and getting authorization to search the backpack from the probation officer. The purpose of the trooper's actions also weighed in favor of attenuation because there was no showing "of flagrant or purposeful or systemic misconduct." "Balancing the relative weights of the factors together," the court concluded that after weighing the factors together, "Trooper Weinstein did not exploit an illegality to discover evidence." Thus, the court ruled that the evidence should not be suppressed. While Campbell argued that the federal attenuation

4

doctrine does not apply in Idaho because of the greater protections of the Idaho Constitution, the district court determined that the defense "cited no published Idaho appellate case specifically holding this and *State v. Fenton*[, 163 Idaho 318, 413 P.3d 419 (Ct. App. 2017),] makes no mention of this right under the Idaho Constitution."

Campbell entered into a conditional plea agreement with the State whereby he would plead guilty to trafficking in heroin while preserving his right to appeal the denied suppression motion. In exchange for his plea, the State dismissed his remaining charges. The district court sentenced Campbell to a unified sentence of seventeen years with the first ten years fixed (the mandatory minimum). Campbell timely appealed his judgment of conviction and order of commitment.

## II. STANDARDS OF REVIEW

When reviewing a defendant's denied motion to suppress, this Court applies a bifurcated standard of review. *State v. Marsh*, 171 Idaho 627, 630, 524 P.3d 906, 909 (2023); *State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009). "This Court accepts the trial court's findings of fact unless they are clearly erroneous but freely reviews the trial court's application of constitutional principles to the facts found." *Marsh*, 171 Idaho at 630, 524 P.3d at 909 (quotation marks omitted) (citation omitted). Findings of fact that are supported by substantial and competent evidence are not clearly erroneous. *Id.* at 630–31, 524 P.3d at 909–10.

## III. ANALYSIS

Campbell's primary argument on appeal is whether this Court should reject the federal attenuation doctrine as incompatible with the multiple purposes of Idaho's exclusionary rule. However, the State contends that (1) the trooper had reasonable articulable suspicion to detain Campbell in handcuffs and, even if he did not, (2) the suppression was proper where the evidence would have been inevitably discovered. Campbell responds by asserting that (1) the trial court properly determined that this was an illegal de facto arrest and (2) inevitable discovery was never raised below and is unpreserved for review. While we ultimately conclude that the district court properly denied Campbell's motion to suppress, we reach this same result through a different constitutional analysis.

### A. The State failed to establish that the use of handcuffs on Campbell was a reasonable precaution for the trooper's safety.

Campbell argues that the district court properly concluded that the trooper effectuated an illegal de facto arrest when he placed Campbell and his companion in handcuffs, arguing that the trooper "employed a degree of force which exceeded that justified for an investigatory detention,

5

without any threats to officer safety, alleged violence, or noncompliance on the part of Mr. Campbell." The State disagrees, noting "[i]t is uncontested that Trooper Weinstein had reasonable articulable suspicion to detain Campbell while he investigated the motorcycle theft." The State contends that under the totality of the circumstances, "briefly handcuffing Campbell did not transform that detention into a de facto arrest." For the reasons explained below, we conclude that the district court correctly determined that the State failed to present any evidence during the suppression hearing that the trooper's safety was threatened or that the trooper was concerned for his safety.

The Fourth Amendment to the United States Constitution and Article I, section 17 of the Idaho Constitution both provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV; Idaho Const. art. I, § 17. "A seizure for Fourth Amendment purposes may take the form of an arrest or an investigatory detention." *State v. Maahs*, 171 Idaho 738, 745, 525 P.3d 1131, 1138 (2023). "For an arrest to be considered lawful, it must be based on probable cause." *State v. Bishop*, 146 Idaho 804, 816, 203 P.3d 1203, 1215 (2009) (citation omitted). Investigatory detentions, however, "are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime." *State v. Huntley*, 170 Idaho 521, 526, 513 P.3d 1141, 1146 (2022) (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210).

When determining whether an arrest or an investigative detention has occurred, a court considers "the context of the crime, the stop, and the precautions necessary to an officer's safety." *Reagan v. Idaho Transp. Dep't*, 169 Idaho 689, 697, 502 P.3d 1027, 1035 (2021). This is an objective standard informed by the totality of circumstances in each particular case. *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("[T]he whole picture—must be taken into account."); *State v. Pannell*, 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995). Important factors to consider include: "the seriousness of the crime, the location of the encounter, the length of the detention, the reasonableness of the officer's display of force, and the conduct of the suspect as the encounter unfolds." *Reagan*, 169 Idaho at 697, 502 P.3d at 1035 (quoting *State v. Ferreira*, 133 Idaho 474, 480, 988 P.2d 700, 706 (Ct. App. 1999)). Specificity is key. When justifying the intrusion of a Fourth Amendment seizure, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "This demand for specificity in the information upon which

6

police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence." *Id.* at 22 n.18 (citations omitted).

The need for specificity applies with equal force when evaluating whether the use of handcuffs converts an investigatory detention into an illegal arrest. Although this Court has held that "officers are entitled to use handcuffs in limited investigatory stops to maintain their safety[,]" *State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998), the State must overcome a "high threshold" to justify that level of intrusion, *Pannell*, 127 Idaho at 424, 901 P.2d at 1325. Thus, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicions or 'hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *DuValt*, 131 Idaho at 554, 961 P.2d at 645 (quoting *State v. Johns*, 112 Idaho 873, 878, 736 P.2d 1327, 1332 (1987)).

This Court recently considered an officer's use of handcuffs in *Reagan v. Idaho Transportation Department*, and determined, based upon the totality of the circumstances, that an investigative detention was converted into an illegal de facto arrest. 169 Idaho at 697, 502 P.3d at 1035. In *Reagan*, a concerned citizen called police to report a possible intoxicated driver. *Id.* at 692, 502 P.3d at 1030. Dispatch learned that the vehicle was registered to Reagan and a police officer was dispatched to her residence. *Id.* The officer met Reagan at the door to her home. *Id.* at 692, 698, 502 P.3d at 1030, 1036. Reagan agreed to participate in field sobriety tests and she failed all of them. *Id.* at 692, 502 P.3d at 1030. "The officer then escorted Reagan to the patrol car, handcuffed her, and placed her in the backseat, telling her that she was under arrest for DUI." *Id.* After completing an administrative license suspension advisory, and waiting the requisite fifteen minutes, the officer administered a breathalyzer test, which showed Reagan's blood alcohol content to be 0.188/.0198. *Id.* at 692–93, 502 P.3d at 1030–31. "The officer again informed Reagan she was being arrested for driving under the influence, and transported her to the Bonner County Detention Facility." *Id.* at 693, 502 P.3d at 1031.

This Court concluded that the officer's use of handcuffs in *Reagan* "exceeded the bounds of what was reasonably intrusive in conducting an investigative detention" and "converted the investigative detention into an arrest." *Id.* at 697, 502 P.3d at 1035. We explained that "the threshold for showing that handcuffs were a reasonable precaution for officer safety is high." *Id.* For Reagan, the use of handcuffs was unwarranted because nothing indicated Reagan posed a threat to officer safety and "the officer made no attempt to articulate that such a threat even

existed." *Id.* The alleged crime did not involve violence, there was no resistance, there were no known weapons, and Reagan did not threaten the officer. *Id.* at 697–98, 502 P.3d at 1035–36. This Court concluded that all of these factors taken together made the act of handcuffing Reagan an excessive intrusion that converted the investigative detention into an arrest. *Id.* Also important to this Court's analysis was that the officer was investigating a misdemeanor offense, and he never observed Reagan commit "*any* violation of the law"; yet, he informed Reagan twice that she was "under arrest" before administering the breathalyzer test. *Id.* at 698, 502 P.3d at 1036. Importantly, as occurred in *State v. Clarke*, 165 Idaho 393, 446 P.3d 451 (2019), we again recognized that the Idaho Constitution did not permit a warrantless arrest for a misdemeanor that the officer did not witness. *Reagan*, 169 Idaho at 698, 502 P.3d at 1036.

In contrast, in *State v. Johns*, we upheld the use of handcuffs, because it "was a reasonable precaution for the officer's safety." 112 Idaho at 878, 736 P.2d at 1332. Johns was a suspected murderer who, it was believed, had killed the victim with a knife. *Id.* at 875–76, 736 P.2d at 1329–30. The officer stopped Johns after seeing him drive away from the victim's apartment. *Id.* at 876, 736 P.2d at 1330. The officer was not only alone when he confronted Johns but "concerned for his own safety," knowing that Johns was an armed suspect in a knife killing. *Id.* at 876–77, 736 P.2d at 1330–31. The officer reported that Johns appeared nervous too, and the officer had already seen Johns remove a knife from his vehicle. *Id.* The officer found a second knife when he frisked Johns, and Johns resisted when the officer attempted to remove this weapon. *Id.* These factors, coupled with the officer's testimony, led this Court to conclude that the use of handcuffs was a reasonable safety precaution and did not convert the investigative stop into a de facto arrest. *Id.* at 878, 736 P.2d at 1332.

Here, we agree with the district court's conclusion that the trooper's explanation for Campbell's detention falls short of the "high threshold" required to justify the use of handcuffs during Campbell's detention. This case undoubtedly has some of the same circumstances present in both *Reagan* and *Johns*, including a solo officer acting during dark hours. Yet this case is more comparable to *Reagan*, where a compliant suspect was placed in handcuffs with no evidence cited by the officer as to his safety. As the district court found, the trooper never testified to any safety concerns when he encountered Campbell and Suitter at the convenience store, nor did the trooper testify that he handcuffed them for that purpose. The closest the trooper comes to explaining why

8

he handcuffed Campbell was on redirect examination when he was asked by the prosecutor to explain a "felony stop":

> Q. Can you explain what a felony stop is for a stolen bike?
>
> [objection made and overruled]
>
> Q. What a felony stop is?
>
> A. A typical felony stop involves multiple officers with firearms, pistols and/or rifles drawn pointed at the individuals, instructing them to get on their knees or walk backwards, and then placing them in cuffs and securing them into a vehicle.
>
> Q. Why?
>
> A. It's our training due to safety reasons as it's usually a higher risk crime.

Even with this limited testimony, it is unclear whether handcuffing Campbell and his companion was a result of training[2] or a specific concern for safety. The trooper also did not testify whether he considered this investigative detention to involve "a higher risk crime," or explain why handcuffs were needed here when other cited felony stop procedures were not. The trooper may have had legitimate safety concerns, but the State's failure to present evidence of *any* specific concerns for officer safety has left it for the courts to guess why this trooper chose to handcuff Campbell. While the State invites us to shore up the trooper's testimony on appeal by citing the surrounding circumstances, this is ultimately an invitation to substitute the trooper's testimony with *our* interpretation of the facts. To be sure, the trooper was outnumbered, in a high crime area, as he investigated the stolen motorcycle, and he may have had other safety concerns, but it is the State's burden to elicit such testimony at the suppression hearing, and not rely on an appellate court to search the record for an after-the-fact justification of an officer's actions.

Accordingly, we must conclude that the State failed to establish that the use of handcuffs on Campbell was a reasonable precaution for the trooper's safety. Campbell's stop became a de facto arrest when the suspects were ordered to lie down and were handcuffed. Thus, we affirm the district court's conclusion.

---

[2] We have previously expressed concern with the State attempting to justify unconstitutional police conduct on the mere basis that it was consistent with a department's standard operating procedure or training. *See State v. Saldivar*, 165 Idaho 388, 391–92, 446 P.3d 446, 449–50 (2019) ("[T]he district court's decision appears, at least in part, to be based on its concerns with the officer's testimony that 'it is standard operating procedure . . . to frisk anyone in handcuffs.' The district court was justifiably troubled over the constitutional implications of officers replacing the requisite 'armed and dangerous' analysis with a 'standard operating procedure' of frisking everyone they detain. We have similar concerns with such a notion but conclude that, under an objective analysis, the officers in this case had reasonable, articulable suspicion that Saldivar was armed and dangerous based on the facts of this case.").

**B. While the seizure of Campbell was unreasonable, the inevitable discovery exception to the Fourth Amendment makes suppression improper.**

The State argues that although the prosecutor never raised the issue of inevitable discovery below, application of this exception to the warrant requirement further supports the district court's conclusion that suppression was not required. It argues that the issue was preserved because "the district court sua sponte ruled that inevitable discovery would not apply" in its written ruling. Campbell responds that the district court did not make a ruling but was instead "imagining a situation" and stating that "if the trooper had not violated Mr. Campbell's constitutional rights, the evidence would not have been suppressed, which is inapposite to the exclusionary rule."

There are two issues for this Court to consider: first, whether the issue of inevitable discovery was preserved for appellate review; and second, if preserved, whether the inevitable discovery doctrine makes suppression improper under the circumstance present here.

*1. The doctrine of inevitable discovery was preserved for appeal.*

While this Court has explained that it is not bound by erroneous legal rulings, *Hooley v. State*, 172 Idaho 906, 914, 537 P.3d 1267, 1275 (2023), proper preservation of a legal theory is required for this Court to affirm on the basis of the right result-wrong theory rule, *State v. Hoskins*, 165 Idaho 217, 226, 443 P.3d 231, 240 (2019). Our preservation rule "fosters the full testing of issues by the adversarial process, ensures that factual records are fully developed, aids the Court in the correct resolution of cases through 'the refinement of . . . arguments on appeal and the wisdom of the trial court in deciding the matter in the first instance,' and serves interests of efficiency and finality." *Carver v. Hornish*, 171 Idaho 118, 124, 518 P.3d 1175, 1181 (2022) (quoting *State v. Howard*, 169 Idaho 379, 385, 496 P.3d 865, 871 (2021)). Thus, we have consistently held that we will not consider issues raised for the first time on appeal "unless the record discloses an adverse ruling which forms the basis for the assignment of error." *State v. Yakovac*, 145 Idaho 437, 442, 180 P.3d 476, 481 (2008). More recently, we clarified "that a party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing *or* a party preserves an issue for appeal if the trial court issues an adverse ruling." *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022) (emphasis in original). "Both are not required." *Id.*

Here, the parties presented briefing to the district court on the attenuation doctrine at the district court's request. These arguments developed during, and following, the hearing on the motion to suppress where the district court voiced questions to the parties on whether exceptions

to the exclusionary rule would apply if the court found there was a de facto arrest. Then, in its written decision, the district court made two statements that specifically addressed the doctrine of inevitable discovery. In working through its attenuation analysis, the district court found that "[i]f [the trooper] had just detained the defendant, without handcuffing him, he would have discovered that he was on probation and had signed a Fourth Amendment waiver, as soon as he conducted the relevant inquiries." Later, the court then discounted its own analysis and ruled: "The inevitable discovery doctrine also does not assist the State here since there is no indication that there was a parallel path by which the drug evidence would have been discovered, apart from Trooper Weinstein's encounter with the defendant."

While these statements are contradictory, they are not mere dicta for us to ignore. They were part of the district court's analysis, particularly where the district court expressed concerns to the parties about the application of "exceptions" to the exclusionary rule. These statements show that the district court raised the issue of inevitable discovery in its written ruling, considered it, and ultimately determined the theory did not apply. While this is an admittedly unorthodox path to preservation, this issue was not raised for the first time on appeal; clearly, it was decided by the trial court in the first instance, albeit sua sponte. Moreover, we cannot entirely ignore the possibility that the State could have raised this issue later if it had not been foreclosed from doing so by the district court's ruling. Therefore, the record discloses that an adverse ruling formed the basis for the assignment of error, and the issue of inevitable discovery was sufficiently preserved for our consideration.

### 2. The doctrine of inevitable discovery makes suppression improper.

The inevitable discovery doctrine is a recognized exception to the exclusionary rule in Idaho. *State v. Maxim*, 165 Idaho 901, 908, 454 P.3d 543, 550 (2019). It "allows for the admission of evidence that would have been discovered even without the unconstitutional source," *Utah v. Strieff*, 579 U.S. 232, 238 (2016), and applies where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," *Nix v. Williams*, 467 U.S. 431, 444 (1984). However, "the inevitable discovery exception does not permit us to speculate on the course of action the investigation could have taken in the absence of [the Constitutional violation]—even if that alternate course likely would have yielded the evidence." *Maxim*, 165 Idaho at 909, 454 P.3d at 551 (alteration in original) (quoting *State v. Downing*, 163 Idaho 26, 32, 407 P.3d 1285, 1291 (2017)). "The doctrine must

presuppose inevitable hypotheticals running in parallel to the illegal actions, not in series flowing directly from the officers' unlawful conduct." *Downing*, 163 Idaho at 32, 407 P.3d at 1291.

In *Maxim*, this Court explained that the question of inevitable discovery is "whether the State can prove that the evidence in question would have been inevitably discovered even if the police illegality is removed from the equation." 165 Idaho at 909, 454 P.3d at 551. To answer this question, this Court used the example of branching parallel paths:

> A police investigation often takes branching paths. The inevitable-discovery doctrine presupposes parallel paths leading toward the inevitable discovery of evidence. If, because of illegal police action, one path arrives at the evidence before the other does, then *the State will be permitted to prove that the existing alternative path would have yielded the evidence even if the existing alternative path was cut short due to the discovery of the evidence*. However, the split in the investigation which creates these parallel paths must occur *prior to or independent of the illegality, not because of it*. The question is not what legal path the police would have inevitably taken which could have yielded the evidence. The question is what legal path the police actually took which would have inevitably yielded the evidence. We again stress the astute observation of our Court of Appeals: "The inevitable discovery doctrine 'is not intended to swallow the exclusionary rule whole *by substituting what the police should have done for what they really did*.' "

*Id.* (citations omitted and emphasis added).

The State is correct that the question is not "whether discovery was inevitable apart from the *encounter* with Campbell," but "whether discovery was inevitable apart from the *alleged illegality*—the handcuffing that created the purported de facto arrest." (Emphasis in original). It is undisputed that the trooper had authority and reasonable suspicion to conduct an investigative detention on the stolen motorcycle. Both parties delve into hypotheticals of whether the trooper would have inquired into Campbell's probation status, but the district court's early finding on this issue holds true: "If [the trooper] had just detained the defendant, without handcuffing him, he would have discovered that he was on probation and had signed a Fourth Amendment waiver, as soon as he conducted the relevant inquiries." Thus, contrary to the district court's own conclusion, there were two parallel paths by which the evidence would have inevitably been discovered.

This is demonstrated by logically following the parallel path that was *not* taken. The fork in the road occurred at the point the trooper entered the convenience store and (1) ordered the defendant to get on the ground and (2) placed him in handcuffs. Assuming the alternate path had been taken, and the trooper had detained and questioned the defendant without making a de facto arrest, the trooper would have still learned Campbell's name and called it into dispatch. Then the

12

trooper would have inevitably discovered that the defendant was on probation. Just as occurred on the path taken, the trooper would have next contacted the defendant's probation officer to report that Campbell was being detained during the investigation into a possible felony (a stolen vehicle), and the probation officer would have authorized a search of the backpack. This series of events would have occurred regardless of either the use of handcuffs or the discovery of the loaded magazine on Campbell's companion. Indeed, it is difficult to fathom an alternate path along this investigatory detention where the trooper would *not* have discovered that Campbell was on probation or where the probation officer would *not* have authorized a search of Campbell's backpack during a felony investigation. Thus, it is not a matter of speculation, but of logic and reason to conclude that the subsequent search of Campbell's backpack would have discovered the same evidence under either branching path once the trooper walked into the convenience store. In sum, even if handcuffs had never been used, the evidence would have been inevitably discovered whether the trooper had followed either parallel path.

Under these circumstances, the inevitable discovery doctrine—a well-established exception to the Fourth Amendment warrant requirement—makes suppression of the evidence improper. While the district court ultimately admitted the evidence under an attenuation analysis, its analysis at times conflated inevitable discovery with attenuation—rejecting one Fourth Amendment exception for the other. Inasmuch as the inevitable discovery issue was preserved, and that exception squarely applies to the facts of this case, we conclude that the district court reached the correct conclusion that the evidence from Campbell's backpack should have been admitted. "Where an order of a lower court is correct, but based upon an erroneous theory, the order will be affirmed upon the correct theory." *Andre v. Morrow*, 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984) (citations omitted). Accordingly, we affirm the district court's order denying Campbell's suppression motion on the alternate theory of inevitable discovery.

Because our ruling is based on the inevitable discovery doctrine, which is dispositive of the case at hand, we need not address Campbell's argument that the federal test for attenuation is inconsistent with Idaho's constitutional protections.

## IV. CONCLUSION

The district court correctly determined that suppression was improper. Therefore, we affirm the order of the district court and Campbell's resulting judgment of conviction.

Chief Justice BEVAN and Justice MEYER concur.

13

ZAHN, Justice, dissenting.

I concur fully in Section A of the majority's analysis because I agree that Benny Dean Campbell's stop became an illegal de facto arrest when the trooper handcuffed him. However, I do not agree with the majority's analysis and conclusion in Section B because, for the reasons discussed below, I would conclude that the inevitable discovery exception to the Fourth Amendment is inapplicable.

I agree with the majority's articulation of the inevitable discovery doctrine but disagree with the majority's application of that doctrine to the circumstances here. Whether the inevitable discovery doctrine applies in Campbell's case, in my view, turns on whether there were truly two parallel paths, one of which would have yielded the evidence independent of the trooper's de facto arrest of Campbell. Based on the evidence presented in this case, I would conclude there was not.

The inevitable discovery doctrine creates an exception to the exclusionary rule when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" *Nix v. Williams*, 467 U.S. 431, 444 (1984). "The inevitable-discovery doctrine presupposes parallel paths leading toward the inevitable discovery of evidence." *State v. Maxim*, 165 Idaho 901, 909, 454 P.3d 543, 551 (2019). "If, because of illegal police action, one path arrives at the evidence before the other does, then the State will be permitted to prove that the existing alternative path would have yielded the evidence even if the existing alternative path was cut short due to the discovery of the evidence." *Id.* Critically, "the split in the investigation which creates these parallel paths must occur *prior to or independent of* the illegality, not because of it." *Id.*

In this case there are not parallel paths leading toward the inevitable discovery of evidence. Instead, a single series of events led to the evidence discovered in Campbell's backpack:

1. The trooper detains Campbell for questioning concerning the motorcycle.
2. The trooper orders Campbell and his female companion to the ground and handcuffs them.
3. The trooper pat searches Campbell and the female and finds the loaded handgun magazine in the female's pocket. She tells the trooper that the gun is in her backpack, and the trooper secures the gun.
4. The trooper calls Campbell's information into dispatch and learns that he is on felony probation.

14

5. The trooper calls the Idaho Department of Correction on-call probation officer and tells the probation officer that he has detained Campbell and found a gun in the female companion's backpack. The probation officer tells the trooper that Campbell signed a Fourth Amendment waiver and asks the trooper to search Campbell and his belongings "due to the female being in possession of a firearm."

6. The officer searches Campbell's backpack and finds the drugs.

The majority's holding that the inevitable discovery doctrine applied to allow the admission of the evidence found in Campbell's backpack is faulty because it necessarily relies on what hypothetically would have happened if the unlawful arrest had not occurred. As the majority itself notes, "the inevitable discovery exception does not permit us to speculate on the course of action the investigation could have taken in the absence of [the Constitutional violation]—even if that alternate course likely would have yielded the evidence." *Maxim*, 165 Idaho at 909, 454 P.3d at 551 (alteration in original) (quoting *State v. Downing*, 163 Idaho 26, 32, 407 P.3d 1285, 1291 (2017)). "The doctrine must presuppose inevitable hypotheticals running in parallel to the illegal actions, not in series flowing directly from the officers' unlawful conduct." *Downing*, 163 Idaho at 32, 407 P.3d at 1291.

The majority does not, and cannot, identify parallel paths leading to the same result. Rather, as previously discussed, the evidence demonstrated a single path leading to the evidence. The majority assumes an "alternative path" based on what it believes would have occurred in the absence of the unlawful arrest. However, in an inevitable discovery analysis, "[t]he question is not what legal path the police would have inevitably taken which could have yielded the evidence." *Maxim*, 165 Idaho at 909, 454 P.3d at 551. "The question is what legal path *the police actually took* which would have inevitably yielded the evidence." *Id.* (emphasis added). The majority answers the first question by "logically following the parallel path that was *not* taken" and "[a]ssuming the alternate path had been taken[.]" I cannot square this approach with our inevitable discovery jurisprudence. *E.g.*, *Downing*, 163 Idaho at 32, 407 P.3d at 1291 ("The [inevitable discovery] doctrine 'is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did.' " (alteration in original) (citation omitted)).

The evidence elicited at the suppression hearing does not support application of the inevitable discovery doctrine in this case, and I would therefore conclude that doctrine does not permit the admission of the evidence discovered in Campbell's backpack. While I agree that it is

entirely possible that law enforcement would have, in the absence of the unlawful arrest, still called dispatch and set into motion a series of events that resulted in discovery of the evidence in question, I cannot see where law enforcement set that path into motion "prior to or independent of the illegality" at issue here. Accordingly, I would decline to find that the inevitable discovery exception applied here and would have proceeded to address Campbell's arguments concerning the attenuation doctrine. Where the attenuation issue has not been addressed by the majority and my opinion on that issue will not change the outcome of this appeal, it is not advisable to write what could only be interpreted as an advisory opinion.

BRODY, Justice concurs in the dissent.